UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LORI JACOBS,

          Plaintiff,

vs.

WAL-MART STORES, INC., a Delaware
corporation,

          Defendant.

NO.  3:17-cv-5988-RJB

DECLARATION OF STEPHANIE
BLOOMFIELD RE COLLATERAL SOURCE
ISSUES AND SCOPE OF WILLIAM PARTIN
TESTIMONY

Stephanie Bloomfield declares under penalty of perjury under the laws of the United States as follows:

1.    I am over the age of eighteen and am competent to make this Declaration based upon personal knowledge. I am one of the attorneys representing Plaintiff Lori Jacobs in this matter.

2.    Attached as **Exhibit A** are true and correct copies of Trial Exhibits 42 and 44 (Lori Jacobs' 2016 and 2017 Year End Paystubs reflecting deductions for benefits).

3.    Attached as **Exhibit B** are true and correct copies of Walmart's Associate Benefits Handbook explaining that Long Term Disability ("LTD") coverage allows an

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

employee on LTD to continue healthcare benefits but only if the employee had elected to pay for LTD coverage and also elects to pay for the continued healthcare related premiums.

4.      Attached as **Exhibit C** are true and correct copies of the Verbatim Report of Proceedings from March 1, 2019 reflecting the collateral source issue and the Court's curative instruction.

5.      I deposed Mr. Partin on October 22, 2018, just as discovery closed in this matter.  Following the close of discovery and following his deposition, Mr. Partin provided subsequent reports offering opinions in completely different areas on liability issues unrelated to Plaintiff's damages – the only area where he was timely disclosed as an expert. Attached as **Exhibit D** are true and correct copies of two late "supplemental" reports by Defendant's Damage Expert William Partin dated November 7, 2018 and February 8, 2019.  The first offers numerous liability related opinions outside the area of his expertise and the second deals entirely with collateral source issues.

Dated this 3rd day of March, 2019 at Tacoma, Washington.


 /s/ Stephanie Bloomfield
Stephanie Bloomfield

Bloomfield Dec re Collateral Source Issues - 2 of 3
(3:17-cv-5988)
[4822-7395-4185]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

DECLARATION OF SERVICE

I hereby certify that on March 3, 2019, pursuant to Federal Rule of Civil Procedure

5(b), the foregoing document was served upon the counsel of record via email: therein:

| | |
|---|---|
| Laura E. Kruse | ☐ Via Legal Messenger |
| Lisa Wong Lackland | ☐ Via U.S. Mail |
| Nicole Brodie Jackson | ☐ Via Facsimile: |
| Steven Goldstein | ☐ Via CM/ECF |
| S. Karen Bamberger | ☒ Via E-Service Agreement |
| lkruse@bpmlaw.com | |
| llackland@bpmlaw.com | |
| nbrodiejackson@bpmlaw.com | |
| sgoldstein@bpmlaw.com | |
| kbamberger@bpmlaw.com | |
| **Attorneys for Defendant** | |

/s/  James Beck
James Beck
Gordon Thomas Honeywell LLP

Bloomfield Dec re Collateral Source Issues - 3 of 3
(3:17-cv-5988)
[4822-7395-4185]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

Online Paystub                                                    https://secure.walmartbenefits.com/OnlinePaystub/jsp/psDisplayDetai...

 

## Statement of Earnings and Deductions.
### Wal-Mart Associates, Inc., 702 S.W. 8th St.,Bentonville, Arkansas 72716.

**Pay Period Beginning Date: 12-10-2016 through Ending Date: 12-23-2016**

| | | | | |
|---|---|---|---|---|
| LORI JACOBS<br>163 PARKWAY HEIGHT DR,<br>PORT ANGELES, WA 98362 | **Payee**<br>FIRST FED S&L ASSN OF POR | **Type**<br>CHECK DEPOSIT | **Account #**<br>xxxxxxxxxxxx0213 | **Amount**<br>$2,287.17 |
| | | | **Total Amount** | **$2,287.17** |
| **Deposit Date**<br>12-29-2016 | **Advice #**<br>398765145 | | | |

| W4 Withholding: | Tax Method: | Pay Category: | Exemptions: | Additional Withholding: |
|---|---|---|---|---|
| Federal | Single | Salaried | 1 | $0.00 |

*Note: State and local W4 information is not available at this time.*

| Description | Rate | Hours | Earnings | Year to Date | Type of Deductions | Taxes / Deductions | Year to Date |
|---|---|---|---|---|---|---|---|
| REGULAR EARNING | | | $3,094.08 | $69,580.39 | FEDERAL TAX | $623.82 | $15,932.67 |
| OVERTIME EARN | | | $0.00 | $290.03 | SOCIAL SECURITY | $279.55 | $7,090.62 |
| LUMP SUM HRLY | | | $0.00 | $725.00 | INS MEDICAL * | $99.40 | $2,576.00 |
| OVERTIME/INCT | | | $0.00 | $39.44 | INS DENTAL * | $19.70 | $511.21 |
| INCTV H&W HRLY | | | $0.00 | $2,750.95 | INS LIFE | $4.99 | $129.83 |
| PTO PAY | | | $0.00 | $13,395.52 | INS AD&D * | $2.49 | $64.74 |
| HOLIDAY PAY | | | $0.00 | $391.14 | INS DEP LIFE | $12.24 | $260.94 |
| CO STK CONT | | | $0.00 | $270.00 | INS-STD+ | $0.00 | $0.66 |
| PHARM SUN PREM | | | $0.00 | $150.00 | INS STD | $0.00 | $562.06 |
| H&W EXT EARN | | | $708.33 | $6,543.62 | INS LTD | $0.00 | $569.20 |
| PERSONAL TIME | | | $0.00 | $2,391.74 | INS LTD | $30.42 | $200.87 |
| | | | | | CRITICAL ILL * | $19.66 | $511.16 |
| PERS HRS AVAIL | | 5.53 | | | 401K * | $266.17 | $6,738.08 |
| | | | | | ACCIDENT * | $1.28 | $33.28 |
| | | | | | CO STK CONT | $0.00 | $270.00 |
| | | | | | STOCK PURCH | $150.00 | $3,000.00 |
| | | | | | INS VIS * | $5.52 | $143.52 |
| | | | | | CHECK DEPOSIT | $2,287.17 | $57,032.99 |

| | Earnings | Taxes | Deductions | Net Pay | | | |
|---|---|---|---|---|---|---|---|
| **Current** | $3,802.41 | $903.37 | $611.87 | $2,287.17 | | **Deposit No.** | **Amt. of Deposit** |
| **Year to Date** | $96,527.83 | $23,023.29 | $16,471.55 | $57,032.99 | | 398765145 | $2,287.17 |

**Would you like to receive your W-2 online? Click here for more information.**

Copyright © 2017 Wal-Mart Stores, Inc.

# Exhibit A

PLAINTIFF'S EXHIBIT<br>CASE NO. 3:17-CV-5988-RJB<br>EXHIBIT NO. 42

2/17/2017 1:06 PM

L.J. 000110



# Statement of Earnings and Deductions.

## Wal-Mart Associates, Inc., 702 S.W. 8th St.,Bentonville, Arkansas 72716.

**Pay Period Beginning Date: 09-30-2017 through Ending Date: 10-13-2017**

LORI JACOBS
163 PARKWAY HEIGHT DR,
PORT ANGELES, WA 98362

| Payee | Type | Account # | Amount |
|---|---|---|---|
| FIRST FED S&L ASSN OF POR | CHECK DEPOSIT | xxxxxxxxxxxx0213 | $1,545.31 |
| | | **Total Amount** | **$1,545.31** |

**Deposit Date**
10-19-2017

**Advice #**
428908892

| W4 Withholding: | Tax Method: | Pay Category: | Exemptions: | Additional Withholding: |
|---|---|---|---|---|
| Federal | Single | Salaried | 1 | $0.00 |

*Note: State and local W4 information is not available at this time.*

| Description | Rate | Hours | Earnings | Year to Date | Type of Deductions | Taxes / Deductions | Year to Date |
|---|---|---|---|---|---|---|---|
| REGULAR EARNING | | | $0.00 | $25,998.02 | FEDERAL TAX | $327.23 | $11,481.36 |
| STD EARN-TXBL | | | $2,366.99 | $32,250.22 | SOCIAL SECURITY | $168.97 | $5,209.53 |
| OVERTIME/INCT | | | $0.00 | $2.28 | INS MEDICAL * | $109.30 | $2,289.64 |
| INCTV H&W MGT | | | $0.00 | $1,158.81 | INS DENTAL * | $20.00 | $419.82 |
| INCTV H&W HRLY | | | $0.00 | $2,289.37 | INS LIFE | $4.99 | $104.78 |
| PTO PAY | | | $0.00 | $1,972.20 | INS AD&D * | $2.49 | $52.28 |
| CO STK CONT | | | $0.00 | $270.00 | INS DEP LIFE | $12.24 | $257.03 |
| H&W EXT EARN | | | $0.00 | $7,474.95 | INS LTD | $0.00 | $311.17 |
| | | | | | CRITICAL ILL * | $19.66 | $412.86 |
| | | | | | 401K * | $0.00 | $2,722.70 |
| | | | | | ACCIDENT * | $1.28 | $26.88 |
| | | | | | CO STK CONT | $0.00 | $270.00 |
| | | | | | STOCK PURCH | $150.00 | $2,250.00 |
| | | | | | INS VIS * | $5.52 | $115.91 |
| | | | | | CHECK DEPOSIT | $1,545.31 | $44,591.89 |

| | Earnings | Taxes | Deductions | Net Pay | | Deposit No. | Amt. of Deposit |
|---|---|---|---|---|---|---|---|
| **Current** | $2,366.99 | $496.20 | $325.48 | $1,545.31 | | 428908892 | $1,545.31 |
| **Year to Date** | $71,415.85 | $16,690.89 | $10,133.07 | $44,591.89 | | | |

**Get paid early with the Even app. Click here to download.**

**Would you like to receive your W-2 online? Click here for more information.**

Copyright © 2018 Wal-Mart Stores, Inc.

PLAINTIFF'S EXHIBIT
CASE NO. 3:17-CV-5988-RJB
EXHIBIT NO. 44

L.J. 000111

# Long-term disability

## WHERE CAN I FIND?

Enrollment in long-term disability and when coverage is effective     170

Coverage during a temporary layoff or leave of absence     170

When you qualify for LTD benefits     170

When benefits are not paid     171

When LTD benefits begin     171

Filing an LTD claim     171

Your LTD benefit     172

If you are disabled and working     173

Continuing benefit coverage while disabled     173

When LTD benefit payments end     174

If you return to work and become disabled again     175

If you go on a leave of absence     175

When coverage ends     175

If you leave the company and are rehired     175

If you lose and then regain eligibility     175

This information is intended to be a summary of your benefits and may not include all policy provisions. If there is a discrepancy between this document and the policy issued by Liberty Life Assurance Company of Boston (Liberty), a Liberty Mutual company, the terms of the policy will govern. You may obtain a copy of this policy by contacting the Plan.

Exhibit B

L.J. 000321

# Long-term disability

Your paycheck is the foundation of your financial health. Think about how you would survive financially if you became disabled and were unable to work. Your bills would keep coming, even if your paychecks stopped. When you enroll, Walmart's long-term disability plan works with other benefits you receive during a disability to replace part of your paycheck.

| LONG-TERM DISABILITY RESOURCES | | |
| --- | --- | --- |
| Find What You Need | Online | Other Resources |
| Get more details about long-term disability or file a claim | Go to **WalmartOne.com** | Call Liberty at **800-492-5678** |

## What you need to know about long-term disability

- Walmart offers a long-term disability (LTD) plan and also an LTD enhanced plan. All full-time hourly associates (including full-time hourly pharmacists, field Logistics associates, field supervisor positions in stores and clubs, full-time hourly Vision Center managers and walmart.com functional non-exempt associates) and management associates (including management trainees and California pharmacists) are eligible to enroll in either plan (but may not enroll in both LTD and LTD enhanced plans).

- If you enroll after your initial eligibility period, your long-term disability coverage will not begin until you complete a 12-month waiting period.

- The long-term disability plans work with any other benefits you receive while disabled to replace 50% of your average monthly wage under the LTD plan or 60% of your average monthly wage under the LTD enhanced plan.

- Long-term disability benefits are paid at the end of each 30-day period of disability.

L.J. 000322

# Enrollment in long-term disability and when coverage is effective

You are eligible to enroll in long-term disability coverage if you are:

- A full-time hourly associate; or
- A management associate.

There are two long-term disability plans offered:

- **The LTD plan.** Provides up to 50% of your average monthly wage after your waiting period if you become disabled as defined by the Plan.

- **The LTD enhanced plan.** Provides up to 60% of your average monthly wage after your waiting period if you become disabled as defined by the Plan.

Both plans are insured by Liberty and both have a maximum monthly benefit of $15,000. For more information about your waiting period, see **When long-term disability benefits begin** later in this chapter. For more information about your average monthly wage, see **Your long-term disability benefit** later in this chapter.

The date your coverage begins depends on when you enroll for coverage:

- If you enroll during your initial enrollment period, your coverage begins on your effective date. See the **Eligibility and enrollment** chapter for information on your initial enrollment period and your effective date.

- If you enroll at any time after your initial enrollment period, you will be considered a late enrollee and will be required to finish a 12-month waiting period before your coverage is effective, as described below. You will not pay LTD plan or LTD enhanced plan premiums during your 12-month waiting period.

  – If your late enrollment is due to a status change event, your 12-month waiting period will begin as of the date of the event.

  – If your late enrollment is during an annual enrollment, your 12-month waiting period will begin as of the date you enroll.

You may drop your LTD plan or LTD enhanced plan coverage at any time. If you drop long-term disability and later decide to re-enroll, you will be treated as a late enrollee with a 12-month waiting period, as described above.

You must be actively-at-work at the time of your disability.

## THE COST OF LTD COVERAGE

Your cost for LTD coverage is based on your biweekly earnings, your age and whether you select the LTD plan or the LTD enhanced plan. Premiums are deducted from all wages, including bonuses. You will not be required to pay long-term disability premiums from any long-term disability benefit payments you receive. If, however, you receive any other earnings, including bonuses, through the Walmart payroll systems while you are receiving long-term disability benefits, your premiums will be withheld from those payments.

# Coverage during a temporary layoff or leave of absence

Once your LTD coverage is effective and you are eligible to file a claim for benefits, if you are not actively-at-work due to a temporary layoff or an approved leave of absence, you will continue to be eligible for LTD benefits for 90 days from your last day of work. Your eligibility for LTD benefits will end on the 91st day after your temporary layoff or approved leave of absence begins, but will be reinstated if you return to actively-at-work status within one year.

# When you qualify for LTD benefits

Under the terms of the LTD plan and LTD enhanced plan, "disability" means that, due to a covered injury or sickness during the benefit waiting period and for the next 12 months of disability, you are unable to perform the material and substantial duties of your own occupation, and after 12 months of benefit payments, you are unable to perform the material and substantial duties of any occupation.

In determining whether you are disabled, Liberty will not consider employment factors, including but not limited to: interpersonal conflict in the workplace, recession, job obsolescence, pay cuts, job sharing or loss of professional or occupational license or certification.

To qualify for LTD benefits:

- You must be unable to return to work after the initial benefit waiting period of disability;

- You must continue to be under the appropriate care of a qualified doctor (qualified doctors include legally licensed physicians and practitioners who are not related to you and who are performing services within the scope of their licenses); and

- Liberty must receive and approve certification with accompanying medical documentation of a disability from your qualified doctor before benefits are considered for payment.

L.J. 000323

With respect to covered persons employed as pilots and copilots of an aircraft: "Disability" or "disabled" means that, as a result of an injury or sickness, the covered person is unable to perform the material and substantial duties of his or her own occupation under the applicable Federal Aviation Administration fitness standards.

## When benefits are not paid

Benefits will not be paid for any LTD claim due to:

- War, declared or undeclared, or any act of war;

- Active participation in a riot;

- The committing of or attempting to commit a felony or misdemeanor;

- Cosmetic surgery, unless such surgery is in connection with an injury or sickness sustained while the individual is a covered person; or

- A gender change, including, but not limited to, any operation, drug therapy or any other procedure related to a gender change.

No benefit will be payable during any period of incarceration.

**PRE-EXISTING CONDITION EXCLUSION**

You will not receive LTD benefits for any condition, diagnosed or undiagnosed, for which you had received treatment during the 365-day period prior to your effective date unless you have not been treated for the same or related pre-existing condition for more than 365 days while insured. Under the terms of the pre-existing condition exclusion, you are receiving "treatment" when you are consulting, receiving care or services provided by or under the direction of a physician, including diagnostic measures; being prescribed drugs and/or medicines, whether you choose to take them or not; and taking drugs and/or medicines.

## When LTD benefits begin

If you are approved by Liberty for LTD benefits, they will begin after your waiting period:

- **For full-time hourly associates:** Your waiting period is 26 weeks or the end of your short-term disability benefits — whichever is longer.

- **For management associates:** Your waiting period is 90 days or the end of your employer-sponsored salary continuance program — whichever is longer.

If you are approved for LTD benefits, any illness protection, vacation or personal pay may not be used while receiving LTD benefits. If you are drawing LTD and you are approaching your anniversary date, you can receive a payout of your vacation time the pay period before your anniversary.

**IF YOU RETURN TO WORK DURING YOUR WAITING PERIOD AND BECOME DISABLED AGAIN**

- **For full-time hourly associates:** If you cease to be disabled and return to work for a total of 60 calendar days or less during a waiting period, the waiting period will not be interrupted (although the days you work will not be counted toward your benefit waiting period). If you return to work for a total of more than 60 calendar days while satisfying your benefit waiting period, you must satisfy an entirely new benefit waiting period.

- **For management associates:** If you cease to be disabled and return to work for a total of 180 calendar days or less during a waiting period, the waiting period will not be interrupted (although the days you work will not be counted toward your benefit waiting period). If you return to work for a total of more than 180 calendar days while satisfying your benefit waiting period, you must satisfy an entirely new benefit waiting period.

## Filing an LTD claim

**Full-time hourly associates:** If you are on an approved short-term disability claim, your claim will be automatically transitioned from Sedgwick to Liberty around the 17th week of disability.

**Management associates:** If you believe you will need to use your LTD benefit, call Liberty at **800-492-5678**. To avoid any delay in receiving your benefit, make this call by approximately the 45th day of your salary continuance, or as soon as you know you will need to use your benefit. Liberty will provide you with additional information on how to complete your claim.

Associates receiving Workers' Compensation benefits and enrolled in the LTD plan or LTD enhanced plan may be eligible for disability benefits after their waiting period has expired. Call Liberty at **800-492-5678** to report your LTD claim. Management associates should call Liberty by approximately the 45th day after they started receiving Workers' Compensation disability benefits. All others should call Liberty by approximately the 90th day after they have started receiving these benefits.

Claims will be determined under the time frames and requirements set out in the **Claims and appeals** chapter. You have the right to appeal a claim denial. See the **Claims and appeals** chapter for details.

L.J. 000324

# Your LTD benefit

The amount of your LTD benefit is based on:

- Your average monthly wage; and
- If you are enrolled in the LTD plan or the LTD enhanced plan.

| AVERAGE MONTHLY WAGE | |
|---|---|
| Length of employment | How average monthly wage is determined |
| Employed 12 months or more | Total gross pay ÷ prior 12 months<br><br>For example, the average monthly wage for an associate with a total annual gross pay of $36,000 is $3,000 ($36,000 ÷ 12). |
| Employed less than 12 months | Total gross pay ÷ number of months worked<br><br>For example, the average monthly wage for an associate with a total gross pay of $21,000 for seven months of work is $3,000 ($21,000 ÷ 7). |

Total gross pay includes:

- Overtime;
- Bonuses;
- Vacation;
- Illness protection (not including any previous disability benefits); and
- Personal pay for the 26 pay periods (52 if paid weekly) prior to your last day worked.

If you have been employed less than 12 months, an annualized average of earnings will be used, excluding reimbursed expenses.

Your LTD benefit is shown below:

| YOUR LTD BENEFIT | |
|---|---|
| If you enrolled | Your coverage is |
| In the LTD plan | 50% of your average monthly wage minus the amount of other benefits or income you or your family are eligible to receive (for example, Social Security disability benefits*) |
| In the LTD enhanced plan | 60% of your average monthly wage minus the amount of other benefits or income you or your family are eligible to receive (for example, Social Security disability benefits*) |

*See **Other benefits or income that reduces LTD benefits** for more information.

The maximum monthly benefit under both the LTD plan and the LTD enhanced plan is $15,000. Your benefit will be no less than $50 for any month that you are eligible to receive LTD benefits. The total of your monthly disability payment, plus all earnings, cannot exceed 100% of your average monthly wage prior to your disability.

LTD benefits are paid at the end of each 30-day period of disability, as long as you continue to be disabled as defined by the Plan.

Liberty has the right to recover, and you must repay, any amount that is overpaid to you for LTD benefits under this Plan.

### TAXES AND YOUR LTD BENEFIT

You pay the costs of your LTD coverage with after-tax contributions. As such, benefits payable to you under the LTD plan are not subject to income taxes.

### OTHER BENEFITS OR INCOME THAT REDUCES LTD BENEFITS

Your LTD benefit amount will be reduced, or offset, by other benefits or income you or your family receives or are eligible to receive. Examples include but are not limited to income from the following:

- Social Security disability insurance;
- Social Security retirement benefits that are received after the date of total disability;
- Workers' Compensation;
- Employer-related individual policies;
- No-fault automobile insurance;
- An employer retirement plan that begins after the date of the total disability; and
- Settlement or judgment, less associated costs of a lawsuit, that represents or compensates for your loss of earnings.

If any of the benefits that reduce your LTD benefits are subsequently adjusted by cost-of-living increases, your LTD benefit will not be further reduced. Please refer to the policy for a complete list of offsets. You may obtain a copy of the LTD policy by calling Liberty at **800-492-5678**.

L.J. 000325

| REDUCTION OF LTD BENEFIT EXAMPLE | | |
|---|---|---|
| **Annual salary: $36,000** | **LTD Plan (50%)** | **LTD Enhanced Plan (60%)** |
| Average monthly wage | $3,000 | $3,000 |
| Benefit amount (percentage of average monthly wage, subject to the $15,000 maximum) | $1,500 | $1,800 |
| Less estimated Social Security disability benefit | -$750 | -$750 |
| Less dependent's estimated Social Security benefits | -$375 | -$375 |
| LTD payment (monthly) | $375 | $675 |

**APPLYING FOR SOCIAL SECURITY DISABILITY BENEFITS**

You may be eligible to receive Social Security disability benefits after you have been disabled for five months. If your disability is expected to last, or has already lasted, 12 consecutive months, the LTD policy terms may require you to apply for Social Security disability benefits. If the Social Security Administration denies you benefits, you will be required to follow the Social Security Administration's appeal process.

Failure to file for Social Security disability benefits could result in your Social Security retirement benefits being reduced when you reach the age of retirement. If you qualify for Social Security disability benefits while you are receiving benefits under the LTD plan and your Social Security disability claim is approved retroactively, you must reimburse Liberty for any LTD benefits overpaid during the period covered by the retroactive Social Security approval.

## If you are disabled and working

You may be eligible to receive disability benefits if you are partially disabled. Under the Plan, "partial disability" and "partially disabled" mean that, as a result of sickness or injury, you are able to:

- Perform one or more, but not all, of the material and substantial duties of your own or any occupation on a full-time or part-time basis; or
- Perform all of the material and substantial duties of your own occupation on a part-time basis; and
- Earn between 20% and 80% of your indexed pre-disability earnings.

The following calculation is used to determine your monthly benefit for a partial disability.

| DISABLED AND WORKING BENEFIT CALCULATION | |
|---|---|
| $$\frac{(A - B) \times C}{A} = D$$ | |
| A | Your indexed pre-disability monthly earnings |
| B | Your current monthly earnings |
| C | The monthly benefit payable if you were qualified as totally disabled |
| D | The disabled and working benefit payable |

Your "pre-disability monthly earnings" means your regular monthly rate of pay in effect for the 26 regular pay periods (52 if paid weekly) immediately prior to your last day worked, divided by 12. Pre-disability earnings include overtime, bonuses, vacation, illness protection and personal pay, but not commissions or any other fringe benefits or extra compensation. If you have worked for less than 12 months with the company, your regular monthly rate of pay will be based upon the total earnings you actually received while working for the company immediately prior to the date you became totally disabled, annualized and divided by 12.

Your "indexed pre-disability monthly earnings" means your pre-disability earnings increased annually by 7% or the percentage change in the Consumer Price Index, whichever is less.

## Continuing benefit coverage while disabled

If you wish to continue medical, dental, vision, AD&D, optional associate and dependent life insurance, critical illness insurance and accident insurance coverage while you are receiving LTD benefits, you must make premium payments each pay period. These amounts will not be deducted from your LTD benefit payments. If you fail to pay your premiums for your other benefit plan(s), your benefits may be canceled. See the **Eligibility and enrollment** chapter for details.

Your disability coverage will not be canceled while you are receiving disability benefits under this policy. You will not be required to pay STD enhanced plan or LTD plan premiums from any LTD benefit payments received. If, however, you receive any other earnings through the Walmart payroll systems while you are receiving LTD benefits, your premiums will be withheld from those payments.

L.J. 000326

**IF YOU DIE WHILE RECEIVING LTD BENEFITS**

Coverage under the LTD plan and LTD enhanced plan ends upon your death. However, if you die while you are receiving LTD benefits, a lump-sum payment of $5,000 will be paid to your surviving spouse/partner. If you are not survived by a spouse/partner, the payment will be made to your surviving children in equal shares. If you are not survived by a spouse/partner or children, the payment will be made to your estate.

## When LTD benefit payments end

LTD benefit payments will end on the earliest of:

- The date you fail to furnish proof of continued disability and regular attendance of a doctor;

- The date you fail to cooperate in the administration of your claim. For example: providing information or documents needed to determine whether benefits are payable and/or determining the benefit amount;

- The date you refuse to be examined or evaluated at reasonable intervals;

- The date you refuse to receive appropriate available treatment;

- The date you refuse a similar job with Walmart, paying comparable wages, where workplace modifications or accommodations are made to allow you to perform the material and substantial duties of your job;

- The date you are able to work in your own occupation on a part-time basis but choose not to;

- The date your partial disability monthly earnings exceed 80% of your indexed pre-disability earnings;

- The date you are no longer totally disabled;

- The last day of the maximum period for which benefits are payable (see chart below); or

- The date of your death.

| MAXIMUM DURATION OF LTD BENEFITS | |
|---|---|
| Age when you become totally disabled | Benefits duration (Years of LTD benefits) |
| Prior to age 62 | Until normal retirement age (as listed to the right) |
| 62 | 4 years |
| 63 | 3½ years |
| 64 | 3 years |
| 65 | 2½ years |
| 66 | 2¼ years |
| 67 | 2 years |
| 68 | 1¾ years |
| 69 or older | 1½ years |

| SOCIAL SECURITY NORMAL RETIREMENT AGE | |
|---|---|
| Year of birth | Normal retirement age |
| 1937 or before | 65 |
| 1938 | 65 + 2 months |
| 1939 | 65 + 4 months |
| 1940 | 65 + 6 months |
| 1941 | 65 + 8 months |
| 1942 | 65 + 10 months |
| 1943 through 1954 | 66 |
| 1955 | 66 + 2 months |
| 1956 | 66 + 4 months |
| 1957 | 66 + 6 months |
| 1958 | 66 + 8 months |
| 1959 | 66 + 10 months |
| 1960 or after | 67 |

L.J. 000327

**IF THE DISABILITY IS DUE TO MENTAL ILLNESS, ALCOHOLISM OR DRUG ADDICTION**

To receive LTD benefits for more than 24 months for the following disabilities, you must be confined in a hospital or other facility licensed to provide medical care:

- Mental illness (excluding demonstrable, structural brain damage);

- Any condition that results from mental illness;

- Alcoholism; and

- Non-medical use of narcotics, sedatives, stimulants, hallucinogens or similar substances.

When you are not confined to a hospital or other licensed facility, there will be a 24-month lifetime benefit for these disabilities unless you are fully participating in an extended treatment plan for the condition that caused the disability, in which case the benefit will be payable for up to 36 months.

## If you return to work and become disabled again

If you return to work for less than six months of active full-time work and become totally disabled again from the same or a related condition that caused the first period of disability, the recurrent disability will be part of the same disability.

If you return to work as an active full-time associate for six months or more, any recurrence of a disability will be treated as a new disability. A new waiting period must be completed.

## If you go on a leave of absence

You may continue your coverage up to the last day of an approved leave of absence, provided that you pay your premiums either before the leave begins or during the leave. For information about making payments while on a leave of absence, see the **Eligibility and enrollment** chapter.

## When coverage ends

Your LTD coverage ends:

- At termination of your employment, except that coverage will be continued if you are absent due to disability during the benefit waiting period and any period during which premium payments are waived;

- On the last day of the pay period when your job status changes to part-time;

- Upon failure to pay your premiums;

- On the date you lose eligibility;

- On the 91st day of an approved leave of absence (unless you return to work);

- When the benefit is no longer offered by the company; or

- The day after you drop coverage; or

- On the date of your death.

## If you leave the company and are rehired

If you leave the company and return to full-time work for the company within 13 weeks, you will automatically be re-enrolled for the same coverage plan you had prior to leaving the company (or the most similar coverage offered under the Plan). If you are automatically re-enrolled in LTD plan or LTD enhanced plan coverage and choose to drop it after you return, you may do so at any time.

If you return to full-time work after 13 weeks, you will be considered newly eligible and may enroll for coverage under the time periods and conditions described in the **Eligibility and enrollment** chapter.

## If you lose and then regain eligibility

If you lose eligibility and then regain eligibility within 30 days, you will automatically be re-enrolled for the same coverage you had prior to losing eligibility (or the most similar coverage offered under the Plan).

If you lose eligibility and then regain eligibility after 30 days, you will be considered newly eligible and may enroll for coverage under the time periods and conditions described in the **Eligibility and enrollment** chapter.

L.J. 000328

1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____

```
LORI JACOBS,                  )
                              )
              Plaintiff,      )  3:17-cv-5988-RJB
                              )
                              )  Tacoma, Washington
v.                            )
                              )  March 1, 2019
WALMART STORES, INC., a       )
Delaware corporation,         )  Jury Trial
                              )
              Defendant.      )
```

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. BRYAN
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

```
  For the Plaintiff:      STEPHANIE L. BLOOMFIELD
                          JAMES W. BECK
                          Gordon Thomas Honeywell LLP
                          1201 Pacific Avenue
                          Suite 2100
                          Tacoma, Washington 98401


  For the Defendant:      SYLVIA KAREN BAMBERGER
                          LAURA E. KRUSE
                          LISA WONG LACKLAND
                          Betts Patterson & Mines
                          701 Pike Street
                          Suite 1400
                          Seattle, Washington 98101
```

Proceedings stenographically reported and transcribed with
computer-aided technology

Exhibit C

```
 1                    EXAMINATION INDEX

 2

 3   EXAMINATION OF:                                    PAGE

 4    SUSANNE HILAND      CROSS-EXAMINATION (Resumed)      4
                          By Mr. Beck
 5                        REDIRECT EXAMINATION            12
                          By Ms. Kruse
 6
      MEGAN DOMOSZLAY     DIRECT EXAMINATION              15
 7                        By Mr. Beck
                          CROSS-EXAMINATION              21
 8                        By Ms. Bamberger

 9    ANITA COLLEY        DIRECT EXAMINATION              23
                          By Ms. Bloomfield
10                        CROSS-EXAMINATION              31
                          By Ms. Bamberger
11
      MELISSA BENZ        DIRECT EXAMINATION              35
12                        By Mr. Beck
                          CROSS-EXAMINATION              40
13                        By Ms. Bamberger

14    JON JACOBS          DIRECT EXAMINATION              42
                          By Ms. Bloomfield
15                        CROSS-EXAMINATION              56
                          By Ms. Bamberger
16
      LORI JACOBS         DIRECT EXAMINATION              75
17                        By Mr. Beck
                          CROSS-EXAMINATION              86
18                        By Ms. Bamberger
                          REDIRECT EXAMINATION           114
19                        By Mr. Beck

20    CHRISTINA TAPIA     DIRECT EXAMINATION             117
                          By Ms. Bloomfield
21                        CROSS-EXAMINATION             126
                          By Ms. Bamberger
22                        REDIRECT EXAMINATION          136
                          By Ms. Bloomfield
23
      SHIRLEY LEWIS       DIRECT EXAMINATION             145
24                        By Ms. Bamberger
                          CROSS-EXAMINATION             158
25                        By Mr. Beck
                                                        171
```

Jon Jacobs - Cross

1   A   Since she has lost --

2   Q   Since she is no longer working at Walmart, have you had

3   any communications with anyone at Walmart about that issue?

4   A   Yes.

5   Q   Who have you talked to?

6   A   The only one I recall is -- this might have been a couple

7   of years ago, a year ago maybe, I was in for a vision exam,

8   and one of the vision technicians asked me about Lori losing

9   her job, and she asked me why she lost her job.

10   Q   So the vision technician you saw, is that within the

11   pharmacy part of Walmart?

12   A   It is not.  It is separate from the pharmacy.

13   Q   Does that mean you still go to Walmart?

14   A   Yeah, we still get our prescriptions there, yes.

15   Q   Do you also shop there?

16   A   Periodically.

17   Q   Does your wife still have an employee discount that

18   applies when you go there?

19   A   Yes.

20   Q   And you said you get your prescriptions filled there; is

21   that true?

22   A   Yes.

23   Q   And Walmart is still providing your wife and you health

24   benefits, right?

25   A   Yes.

1    Q   I am just going through my notes here.  I think I'm about

2    done.  I think I am.  I thank you very much.

3         MS. BLOOMFIELD:  Your Honor, I have nothing further

4    for this witness, but I would ask him to stay on the stand

5    for an issue outside the presence of the jury.

6         THE COURT:  Okay.  You folks may be excused until

7    1:00.  Follow my instructions about recesses, and come back

8    at 1:00 ready to go to work.

9         (At this time the jury left the courtroom.)

10        MS. BLOOMFIELD:  Ms. Bamberger just raised the issue

11   of the health insurance that Walmart is providing.  That

12   health insurance is being provided pursuant to the long-term

13   disability policy that Ms. Jacobs purchased as part of her

14   employment.  I didn't want to bring this in up redirect in

15   front of the jury.  I am happy to examine the witness about

16   it.  I had him review the policy last night to confirm this

17   for me.

18      So now the jury is being left with the impression that

19   Walmart, out of the goodness of its heart, is providing

20   healthcare coverage when that is not correct.  So I wanted to

21   raise this issue and see -- we may have to address it with an

22   instruction.

23        MS. BAMBERGER:  Your Honor, I am aware of the motion

24   in limine.  I am acutely aware of your ruling about

25   short-term, long-term disability.  I didn't ask about any of

1  those.

2      My further understanding is because Ms. Jacobs was a

3  salaried employee, she actually was not paying for those

4  benefits.  I know there was discussion when we had the

5  pretrial hearing about -- I remember Mr. Beck showing you

6  that there were some indications on her pay stubs that show

7  STD and LTD which, by the way, your Honor, I believe that

8  document is in evidence.  I think they opened the door.  They

9  have submitted that document.

10     In addition, Ms. Hope-Jurado testified -- I can't honestly

11  remember if it was a question by plaintiff's counsel or

12  defense, but she has mentioned healthcare benefits.  That is

13  our position.  We were mindful of your Honor's ruling.

14          THE COURT:  Well, we have, I guess, two choices.  One

15  is to instruct the jury to disregard the comment.  The other

16  is to open it up and have testimony explaining that

17  particular benefit.

18          MS. BLOOMFIELD:  I think prolonging the trial to go

19  into a mini explanation with testimony about the long-term

20  disability coverage and insurance benefits, I would strongly

21  prefer an instruction that the jury should disregard that.

22  We can do it, but I think the appropriate way to handle this

23  would be with an instruction.

24     And, your Honor, if you would like -- over the lunch hour

25  I can have my office file the long-term benefits policy and

1   highlight the language, if the Court needs that as an offer

2   of proof.  It is at LJ173 in the materials we produced.

3          MS. BAMBERGER:  Again, your Honor, I think that the

4   plaintiffs opened the door to this by submitting the pay

5   stubs, you know, that the jury is going to pour over.  They

6   know what STD and LTD means.  I didn't elicit any testimony

7   about short-term, or long-term, or Social Security.

8      If your Honor is considering one of the two options, I

9   would say I too prefer not to prolong the trial and for the

10  jury to be instructed, if those are my only choices.  But I

11  would urge the Court to just move on.  I think you are

12  actually going to highlight the issue that the jury may not

13  otherwise note.

14         THE COURT:  Well, as the record stands now, I think

15  the proper thing to do is instruct the jury to disregard

16  evidence regarding Mr. and Mrs. Jacobs receiving healthcare

17  benefits.  If that should all be opened, we can still open it

18  up, but I don't -- I think there is more heat than light

19  there.  It would require -- if it is opened up, it would

20  require some understanding of who paid for that, and who is

21  paying for that, and who will pay for that in the future, and

22  how much, and whether it should be reduced from any damages

23  that might be awarded.  It is a big bunch of stuff that it

24  seems to me that both sides have said they don't want to get

25  into.  That's my ruling.

1     I will instruct the jury to disregard that when we go back

2  in session at 1:30, and then we will go on from there.

3     You can step down, Mr. Jacobs.  Thank you.  You all can

4  get out of the way here so I can conduct a criminal

5  proceeding.

6         MS. BAMBERGER:  Your Honor, you just said 1:30.  You

7  meant 1:00.  We should be back here by 1:00.

8         THE COURT:  No, 1:00.  I told the jury 1:00, didn't

9  I?

10        MS. BAMBERGER:  Thank you, your Honor.

11

12                              (Recessed.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                      AFTERNOON SESSION

2                                      MARCH 1, 2019

3          MS. BAMBERGER:  Your Honor, we just wanted to put

4    this on as an offer of proof on the record, if your Honor is

5    still inclined to give the instruction to the jury in terms

6    of the health insurance issue.  We wanted to point out that

7    A41, a defense exhibit, was admitted into evidence.  It does

8    refer to health insurance benefits.

9          THE COURT:  I'm sorry.  What number?

10         MS. BAMBERGER:  A41.

11         THE COURT:  Wasn't part of that redacted?

12         MS. BAMBERGER:  Yes, your Honor, the part dealing

13   with, I think it was disability.

14         MS. BLOOMFIELD:  The first sentence is redacted, your

15   Honor.

16         MS. BAMBERGER:  My point, your Honor, is it still

17   makes reference to health insurance benefits.  In addition,

18   plaintiff submitted Exhibit 42.  That's the pay stub, and

19   that also includes the medical and dental.  And our argument

20   wouldn't be that we are asking for an offset, but plaintiff

21   should not be able to argue that Walgreens isn't allowing

22   her -- did I say Walgreens?  Sorry.  Walmart, I beg your

23   pardon -- that Walmart is still allowing both

24   Mr. and Mrs. Jacobs to retain their health insurance benefits

25   at the same level.  And so for those reasons, we don't think

1  it is appropriate to instruct the jury.  I think the

2  testimony should stand as is.

3       MS. BLOOMFIELD:  The issue is who is paying for those

4  benefits.  If Ms. Jacobs had not elected to pay for long-term

5  disability insurance, she would have no health benefits

6  whatsoever right now.

7     And so the issue is, because she had the foresight to pay

8  the premiums that are shown on, I believe it is Exhibit 44, I

9  don't have it in front of me, she has the benefit of having

10  health insurance continuation.  Walmart isn't the source of

11  that.  Ms. Jacobs' collateral source benefits are.

12       MS. BAMBERGER:  Your Honor, it is not the situation

13  where Ms. Jacobs had to pay for COBRA.  Walmart is still

14  allowing her those benefits at the same level as before.

15       THE COURT:  Go ahead.

16       MS. BLOOMFIELD:  I think counsel is missing the

17  point.  This is a collateral source benefit.  I am happy to

18  brief it and provide the long-term disability language that

19  explains it.  That's why I had Mr. Jacobs stay up there if we

20  needed to make a formal offer.

21       THE COURT:  I guess it seems to me that because of

22  her work at Walmart she is able to maintain her health

23  insurance.  That is a benefit -- the right to have it is a

24  benefit.  That's the benefit she is getting from Walmart, is

25  the right to stay on her health insurance.  That's not the

 1   same as Walmart paying for her health insurance or for the

 2   family's health insurance.  I think basically there is more

 3   heat than light, as I said before, to go into this.  I don't

 4   think it has been opened up by what's been filed.  But to

 5   leave the record as it is now is to, I think, leave a false

 6   impression.  So I am going to persist in my ruling that I

 7   made earlier and instruct the jury to disregard that portion

 8   of Mr. Jacobs' testimony regarding healthcare benefits.  And

 9   if you all want to go into this in some depth at some point,

10   you can reopen it.  I think it is a side issue that doesn't

11   make a whole lot of difference in the scheme of things.

12   Okay?

13       Bring in the jury.

14   (The following occurred in the presence of the jury.)

15             THE COURT:  Ladies and gentlemen, Mr. Jacobs was

16   testifying this morning.  You are to disregard that portion

17   of his testimony regarding healthcare benefits.  You may call

18   your next witness.

19             MR. BECK:  The plaintiff calls Lori Jacobs.

20                         LORI JACOBS,

21       having been sworn under oath, testified as follows:

22             THE COURT:  You can be seated here, Ms. Jacobs.

23                      DIRECT EXAMINATION

24   By Mr. Beck:

25   Q   Can you please state your name for the record?

1

2                        C E R T I F I C A T E

3

4

5        I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.

7

8

9

10   */s/ Barry Fanning*

11   BARRY FANNING
     COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# MUELLER* & PARTIN, PS, INC.

### Certified Public Accountants
### Forensic Economists

WASHINGTON FEDERAL CENTER
400 108ᵗʰ AVENUE N.E., SUITE 615
BELLEVUE, WASHINGTON 98004

*Gary E. Mueller - Retired

PHONE:       (425) 455-0303
FACSIMILE:   (425) 455-5176
EMAIL:partin@muellerpartin.com

November 7, 2018

Ms. Lisa Wong Lackland
Betts, Patterson & Mines, P.S.
One Convention Place
701 Pike Street, Suite 1400
Seattle, WA 98101-3927

Re:    *Lori Jacobs v. Wal-Mart Stores, Inc.*

Dear Ms. Lackland:

In accordance with the terms of our engagement, this rebuttal report addresses our concerns regarding the opinions of Donald Downing, as stated in his report dated October 2, 2018. Our rebuttal opinions are specifically limited to Mr. Downing's opinions regarding Defendant Wal-Mart Stores, Inc.'s claim for undue hardship related to providing requested accommodations for Lori Jacobs.

Mr. Downing's conclusions regarding the business impact of accommodations are summarized as follows:

- The task of injecting vaccines was a minimal part of Ms. Jacob's job responsibilities and was peripheral to the central functions of her job.

- Walmart would be expected to request customers to return for immunizations at a later time or date if Ms. Jacobs was the sole pharmacist on duty. Patients would return later to obtain immunizations and would not switch to another pharmacy provider. It is not damaging to a pharmacy's brand to ask a patient to return at a later time or date for an immunization.

We disagree with these opinions expressed by Mr. Downing for reasons described in the following paragraphs:

Pharmacists are the only individuals employed in retail pharmacies who are licensed to provide immunizations. While the number of immunizations provided is small compared

# Exhibit D

to the number of prescriptions filled (1.5% - 1.8%)[1] it is still viewed as a critical service to customers and a driver of sales for other pharmacy and store products. Offering pharmacy services, including the ability to provide immunizations, is an important part of Wal-Mart's business model. The importance to being able to offer immunizations is demonstrated by the fact retail pharmacy industry has lobbied heavily to influence state lawmakers to allow pharmacists to provide immunizations. Wal-Mart and its competitors viewed immunization services as an important driver of revenues for the pharmacy, in addition to a service that attracts customers to their store, increasing overall revenues. Retail pharmacies advertise the ease and availability of immunizations and often offer cash cards as well to entice new customers to come into the store. Pharmacies generate high profit margins on immunizations due to high reimbursement rates from insurers and generate ancillary sales in the pharmacy and throughout the store from shoppers who might otherwise not have come to the pharmacy.

Mr. Downing's opinions fail to consider the broader implications to Wal-Mart's business if it were to regularly deny immunization services to customers because it did not staff a pharmacist with the ability to provide immunizations. A primary marketing goal of all retailers is to create a positive customer experience that encourages repeated patronage. Telling a customer that you are unable to provide an advertised service, fails to meet that goal.

Wal-Mart competes for business with multiple other big box retailers, chain pharmacies, grocery stores and stand-alone community pharmacies. A potential customer who was asked to return on another day to receive an immunization may travel to one of Wal-Mart's nearby competitors to seek the desired service. The services offered by Wal-Mart can easily be substituted by products and services offered by its competitors. Customer preferences when it comes to mass market retailers are generally based upon convenience, price and service experience. Wal-Mart would be disadvantaged in this circumstance by harming two of those factors: convenience and service experience. Any loss of customers who seek injections at Wal-Mart's competitors will result in lost revenues to the pharmacy and lost revenues to the rest of the store.

Establishing customer loyalty is critical to retail sales.  Customers expect consistency in the availability of products and services from a retail pharmacy like Wal-Mart. A customer who has had a prior experience of being unable to obtain an immunization at a Wal-Mart store is less likely to return to that store in the future the next time they need an immunization or other product or service. Each time Wal-Mart turns away a customer, it is at risk of losing revenues from that visit as well as potential future sales.  Mr. Downing's assertion that it is not damaging to a pharmacy's brand to ask a patient to return at a later

---

[1] Walmart-Jacobs001821.

Ms. Lisa Wong Lackland
November 7, 2018
Page **3** of **3**

date is unsupported by any statistical data and inconsistent with the body of professional literature on marketing. Mr. Downing's assertion is also inconsistent with Wal-Mart's stated "Customer-Driven" mission statement.

Mr. Downing asserts Wal-Mart's pharmacies where Ms. Jacobs worked averaged two immunizations per day per pharmacy, and the loss of any customers would prove inconsequential. Our research indicates the size of the pharmacy immunization market is expected to grow. The data provided by Wal-Mart on the number of immunizations provided at stores #02196 and #05273 show a trend of increasing immunizations each year.[2] Wal-Mart would lose an increasing number of immunization customers due to Ms. Jacobs' inability to provide injections each year.[3] Wal-Mart would additionally incur lost ancillary sales from pharmacy and other departmental sales not captured.

The total loss of revenue that would likely be realized by Walmart as a result of turning away injection requests cannot be calculated based on the information provided. Meeting Ms. Jacobs request for accommodation would require that Wal-Mart incur payroll costs for a 2nd pharmacist exceeding $100,000 per year or incur a significant business income loss. The opinions of Mr. Donald Downing lack any objective basis and are directly contradicted by the body of knowledge in the field of consumer retail marketing and customer service.

Mr. Downing implies that Walmart should have changed its injection delivery device from Needles to a PharmaJet® device for the sole purpose of accommodating Ms. Jacobs' needs. He failed to discuss cost differentials, training costs, purchasing inefficiencies, potential liability concerns and other factors that currently leave needles as the predominate delivery device in retail pharmacies. Requiring Walmart to adopt technology not commonly used in the industry does not appear to be a reasonable form of accommodation.

Very truly yours,

William E. Partin, CPA/ABV/MAFF/CFE

---

[2] Walmart-Jacobs001821.
[3] Ms. Jacobs 24 hour per week schedule equates to 31% of the pharmacy's total open hours (9am – 8pm daily).

# MUELLER* & PARTIN, PS, INC.

WASHINGTON FEDERAL CENTER
400 108th AVENUE N.E., SUITE 615
BELLEVUE, WASHINGTON 98004

*Gary E. Mueller - Retired

**Certified Public Accountants**
**Forensic Economists**

PHONE:        (425) 455-0303
FACSIMILE:   (425) 455-5176
EMAIL:partin@muellerpartin.com

February 8, 2019

Ms. Lisa Wong Lackland
Betts, Patterson & Mines, P.S.
One Convention Place
701 Pike Street, Suite 1400
Seattle, WA 98101-3927

Re:     *Lori Jacobs v. Wal-Mart Stores, Inc.*

Dear Ms. Lackland:

In accordance with the terms of our engagement, this supplemental report includes calculations of Lori Jacobs' receipt of disability benefits following the date of her alleged wrongful termination from Walmart on April 15, 2017. We understand Ms. Jacobs' receipt of disability benefits should be considered as an offset against an award for damages for lost wages resulting from her alleged wrongful termination.

We calculated Ms. Jacobs' receipt of the following sources of disability income:

- Short-Term Disability Income: Ms. Jacobs received short-term disability benefits directly from Walmart from April 15, 2017 through October 15, 2017. Ms. Jacobs' short-term disability benefits totaled $32,250 as summarized from Walmart payroll records on Attachment 5.

- Long-Term Disability Income: Ms. Jacobs began receiving long-term disability benefits from Liberty Life Assurance Company of Boston beginning October 15, 2017.[1] Ms. Jacobs receives a gross monthly long-term disability benefit of $4,288.92. Ms. Jacobs' long-term disability benefits are reduced by the monthly amount of disability benefits she receives from the Social Security Administration. Ms. Jacobs is eligible to continue receiving long-term disability benefits through the month she attains Full Social Security Retirement Age, age 66 and 2 months.

- Social Security Disability Income: The Social Security Administration determined Ms. Jacobs was disabled and entitled to monthly benefit beginning October 2017.

---

[1] LL000156.

Ms. Lisa Wong Lackland
February 8, 2019
Page **2** of **2**

> We utilized Ms. Jacobs' actual benefit rate effective during years 2017 through 2019. We assumed monthly benefits during years 2020 through her Full Social Security Retirement Age in 2022 would increase through annual cost of living adjustments at a rate consistent with the average historical rate of inflation over the last ten year period, as shown on Attachment 2.

We discounted projected future disability benefits to present value dollars as of March 1, 2019. The discount rate utilized to determine net present value is best determined by analyzing the relationships between inflation and rates of return on appropriate investments over a past period of time, typically the past ten to twenty years, which include at least one full business cycle and also reflect economic conditions expected to be generally similar to those of the future. Research has shown that while specific inflation rates and rates of return on investments are difficult to predict with accuracy due to volatility, the spread (mathematical difference) between inflation and investment returns is much more stable and predictable. Our analysis considered the difference between inflation and rates of return on investments in United States Treasury securities with maturities ranging from one to two years over the past ten-year period (refer to Attachments 3 and 4). The maturity durations were selected to match the timing of future years when the disability payments will be made.

We conclude Ms. Jacobs will receive total disability benefits totaling $298,728, as calculated on Attachment 1.

Very truly yours,



William E. Partin, CPA/ABV/MAFF/CFE